D. Craig Parry (#7274)
Stephen C. Mouritsen (#16523)
Parr Brown Gee & Loveless
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone:  (801) 532-7840
Fax:  (801) 532-7750
Email:  cparry@parrbrown.com
        smouritsen@parrbrown.com

*Attorneys for Plaintiff*

---

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| DAVIS LIVESTOCK, INC., a domestic Utah corporation<br><br>Plaintiff,<br><br>vs.<br><br>ROYAL ATLANTIC HOLDINGS, LLC, a foreign Delaware limited liability company; and BRANDON WEBB, an individual;<br><br>Defendants. | **AFFIDAVIT OF TODD DAVIS**<br><br>Case No. 1:18-cv-00022-EJF<br><br>Judge: _____<br><br>Magistrate Judge: Evelyn J. Furse |

STATE OF UTAH          )
                       :ss
COUNTY OF CACHE        )

Affiant, Todd Davis, having been first duly sworn, deposes and states as follows:

1.      I am over the age of 21 and am competent in all respects to make this declaration.

Except as otherwise stated herein, the following facts are based on my personal knowledge.

1

2.      Davis Livestock, Inc. is a three-generation family owned and operated business in Cache County, Utah that has been breeding, selling and brokering diary heifers and other agricultural animals for 70 years.  Davis Livestock ships to farms throughout North America and the world.  I am the President of the company.

3.      Brandon Webb represented to me that Royal Atlantic is a facilitator that partners with other companies to deliver livestock to customers throughout the world, offering assistance with supplying herd, pre-export isolations, export, shipping, import, and sales.

4.      On or about October 31, 2016, Webb contacted Davis Livestock representing that Royal Atlantic had secured a group of buyers of cattle in Turkey and that receipt of the livestock would take place at the port of Izmir, Turkey.

5.      Royal Atlantic and Webb sought financing of the herd from Davis Livestock.

6.      Davis Livestock and Royal Atlantic agreed that Davis Livestock would sell over 3000 head of cattle to Royal Atlantic on the following terms:  (1) Royal Atlantic would pay Davis Livestock its costs and expenses in providing the cattle; (2) Additionally, Royal Atlantic would pay Davis Livestock $162,500 for the Holstein heifers and $350,000 for the Angus cattle; and (3) Payment in full would be provided to Davis Livestock before the cattle were boarded on the ship in the U.S.

7.      In reliance on these representation and this agreement, Davis Livestock acquired the cattle and paid an initial deposit on the cattle of $479,000.  The total price Davis Livestock paid for the cattle was $3,897,673.57.

8.      By text message dated December 2, 2016, attached hereto as Exhibit A, at 3-4, and by emails dated December 5 and 8, 2016, attached hereto as Exhibits B and C, Webb, on

behalf of Royal Atlantic, confirmed that buyers in Turkey had been secured and that receipt of the livestock would take place at the port of Izmir, Turkey.

9.      During September through December, 2016, Webb repeatedly represented to Davis Livestock that Royal Atlantic had the financial resources to facilitate this transaction and cover all necessary costs and fees.

10.      Subsequent statements by Royal Atlantic and Webb and their requests for money indicated to me that they in fact did not have sufficient financial means to pay the necessary costs and fees of the transaction.

11.      On or about December 13, 2016, when the cattle were on route to Pennsylvania, Webb informed Davis Livestock that Royal Atlantic could not pay the deposit for the ship and demanded that Davis Livestock pay $100,000.  Royal Atlantic promised that this amount would be reimbursed before the cattle were boarded on the ship.  Davis Livestock paid the $100,000, but it was not reimbursed.

12.      On or about January 3, 2017, Webb informed Davis Livestock that Royal Atlantic could not pay the quarantine deposit and demanded that Davis Livestock pay $100,000 for the deposit.  Davis Livestock had no choice but to pay given the imminent departure of the ship that was scheduled between January 10 and 15.

13.      On or about January 5, 2017, without permission of Davis Livestock, Webb entered into a feed contract with Green Meadows Forage, LLC as a representative of Davis Livestock.  [See Exhibit D]

14.      On or about January 17, 2017, Davis Livestock became aware that quarantine deposit and invoice remained unpaid and that the $100,000 provided by Davis Livestock to Royal Atlantic for the quarantine deposit was not paid to the quarantine provider.

3

15.     By this time, Davis Livestock had incurred over $1.7 million in expenses on this transaction, including the acquisition cost of the cattle, all of which was at risk of being lost if the cattle were not processed through quarantine in time for boarding the ship.  Accordingly, Davis Livestock had no choice but to pay an additional $100,000 quarantine deposit and a $199,455.66 quarantine bill.

16.     In the same manner, Davis Livestock was also forced to pay feed and veterinary bills that Royal Atlantic was obligated to pay under the terms of the agreement.  Some of these bills were not brought to Davis Livestock's attention until after the cattle were aboard the ship and sailing to Turkey.

17.     Given Royal Atlantic's business and purported experience, the nature and estimated extent of these costs and expenses were known to Defendants in advance, and at the time when Royal Atlantic agreed to pay for all such expenses and at the time Defendants were representing to Davis Livestock that they had the financial wherewithal to fulfill their obligations under the agreement and the transaction.

18.     Davis Livestock provided the agreed-upon livestock to Royal Atlantic at the designated location and in all ways complied with the agreement between the parties.

19.     Royal Atlantic represented to Davis Livestock that there was a delay with the ship such that it would not depart until the end of January, 2017.  On or about January 31, 2017, Davis Livestock learned that Royal Atlantic had started allowing the cattle to be boarded, notwithstanding that Davis Livestock had not been paid as agreed.  Davis Livestock contacted the carrier and requested that all boarding stop; however, on February 1, 2017, the carrier informed Davis Livestock that Webb and Royal Atlantic were instructing that the loading should

continue the next day.  [*See* Exhibit E]  When I contacted Webb, Webb stated that it was all a

misunderstanding.

20.     Contrary to the agreement, Royal Atlantic boarded the cattle onto the ship and

shipped them to Turkey without making payment to Davis Livestock.  Royal Atlantic did this

without having buyers.

21.     As the boarding continued, on February 2, Webb and Royal Atlantic stated that

the outstanding balance owed to Davis Livestock would be "less than $100,000 by tomorrow."

Defendants further misrepresented that letters of credit and cash payments would be received on

February 3.  [*See* Exhibit A, at 18-19]

22.     On February 3, Defendants represented that cash payments were being processed

and would be transferred to Davis Livestock that day, that letters of credit had been approved,

and that all cash proceeds would be passed directly to Davis Livestock.  [*See* Exhibit A, at 20]

23.     The cash and letters of credit were not sent as promised.

24.     The loading of the livestock proceeded on February 4, and the ship undocked on

February 5.  In total, 3,165 head of cattle supplied by Davis Livestock were transported on the

ship, livestock Royal Atlantic had agreed to purchase.

25.     On February 19, while the cattle were at sea, Defendants represented to Davis

Livestock that all original bills of lading required by the letters of credit had been released,

except for the cash buyers whose bills of lading would be released by the following day.  [*See*

Exhibit A, at 22-23]   However, as Defendants knew, Defendants had not secured Turkish

buyers, and neither the cash nor the letters of credit had been received.

26.     The ship carrying the cattle arrived in Izmir on or about February 26, 2017.  By

March 2, 2017, approximately 450 head of cattle could not be discharged from the ship due to

the absence of buyers.  Webb contacted Davis Livestock, stating that if Davis Livestock did not

pay the shipping company an additional $230,000 to transport the remaining 450 head of cattle to

the port of Abhazya, the cattle would be released to Turkish customs and slaughtered.  [*See*

Exhibit A, at 28-29]

27.     On or about March 16 and April 19, 2017, Defendants represented that the 450

head of cattle had been sold for cash, but none of the proceeds were ever transferred to Davis

Livestock.  [*See* Exhibit A, at 33]

28.     In total, Davis Livestock incurred over $4.9 million in expenses for the livestock

that Royal Atlantic was obligated to reimburse under the agreement and pursuant to Defendants'

representations.  While Royal Atlantic has made some payments to Davis Livestock for these

expenses, approximately $1 million remains outstanding.  Additionally, Royal Atlantic never

paid Davis Livestock $162,500 for the Holstein heifers and $350,000 for the Angus cattle.

29.     On June 7, 2017, a representative of Baladna Dairy Farms in Qatar contacted

Davis Livestock and inquired about purchasing several thousand head of Holstein heifers.  Davis

Livestock agreed to supply the cattle.

30.     On May 19, 2017, Defendants had represented to Davis Livestock that they would

share all profits on future deals with Davis Livestock until Davis Livestock was made whole for

the Turkey transaction.  Although Davis Livestock could have fulfilled this order and shipped the

cattle without the involvement of Royal Atlantic, in reliance on Defendants' representations,

Davis Livestock informed Defendants of the opportunity and invited them to participate, as a

way to generate money that Defendants could then use to pay monies owed to Davis Livestock.

31.     Following this introduction, Defendants communicated with Baladna about the

transaction.  [*See* Exhibit F]

32.     Defendants represented to Davis Livestock that it would receive at least $135 per head from the Qatar transaction.  [*See* Exhibit G]

33.     On July 3, 2017, Defendants affirmed to Davis Livestock the amounts owing to Davis Livestock for the Turkey transaction and reaffirmed their commitment to pay the amounts in full.  [*See* Exhibit H]

34.     On July 7, 2017, Defendants informed Davis Livestock that Qatari customs authorities were permitting Defendants to draft the import protocol. [*See* Exhibit I] On July 12, 2017, Defendants Webb forwarded Davis Livestock a link to money.cnn.com, featuring the anticipated Qatari transaction. [*See* Exhibit J] On July 13, 2017, Defendants informed Davis Livestock of the scheduled transportation with Qatar Airways, setting forth the shipment of the cattle from the United States of America to Qatar.  [*See* Exhibit K]

35.     On July 13, 2017, to avoid a repeat of the Turkey transaction, I told Defendants that, "I would like the funds sent directly to my account. I want to know exactly what is going on every step of the way. I brought this deal to you and want to make sure you make money as well but I need to control the purse strings on this one . . ."  [*See* Exhibit K]

36.     On that same day, however, Defendants for the first time asserted that Davis Livestock had no involvement in or right to the proceeds of the Qatar transaction. [*See* Exhibit K]

37.     Unbeknownst to Davis Livestock, and contrary to Defendants' representations, Royal Atlantic entered into an agreement with Baladna for the delivery of the livestock on July 7, 2017.  [*See* Exhibit L]  This contract was not disclosed to Davis Livestock until August 17, 2017.  [*See* Exhibit G]

7

38.     I am informed that in the course of negotiating and working with Baladna and other parties involved in the Qatar transaction, Defendants misrepresented that they were acting for and on behalf of Davis Livestock and misrepresenting their affiliation with Davis Livestock. This was done to induce Baladna to entering into the agreement with Royal Atlantic to the exclusion of Davis Livestock.

39.     Pursuant to the relationship with Baladna, Royal Atlantic has provided 2,000 Holstein heifers to Baladna at a price of $2,395 per head.  I am informed that Baladna has ordered an additional 6,600 head from Royal Atlantic.

40.     I have been informed that when confronted by those in the industry with knowledge of the monies owing from Defendants to Davis Livestock, Webb has relied that, "He [Davis] cannot touch me."

41.     The property sought to be attached by prejudgment writ includes all livestock, receivables, cash, security documents, letters of credit, and other financial instruments held by or in the name of Royal Atlantic Holdings, LLC ("Royal Atlantic assets"), with a registered address of 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801, phone:  717-542-6985, with Brandon Webb and Murat Berk as members.  The property sought to be attached by prejudgment writ further includes all Royal Atlantic assets transferred to Brandon Webb from and after December 1, 2016, except for lawful and legitimate earnings, as that term is used in *Utah Rule of Civil Procedure* 64(a)(5).

42.     The estimated value of the Royal Atlantic assets is unknown to Davis Livestock.

43.     To the best of my knowledge, Royal Atlantic has an account at Wells Fargo Bank N.A., 420 Montgomery Street, San Francisco, CA 94105 and at a Philadelphia, Pennsylvania branch, account number xxx xxx 5704 (redacted for confidentiality purposes).  Wells Fargo

Bank, N.A., International Trade Operations, 1525 West WT Harris Blvd., Charlotte, N.C. may also be holder of certain letters of credit in Royal Atlantic's name.

44.     To the best of my knowledge, the Royal Atlantic assets are neither earnings, as that term is used in *Utah Rule of Civil Procedure* 64(a)(5), nor exempt from execution.

45.     To the best of my knowledge, the Royal Atlantic assets have not been taken for a tax, assessment or fine, nor have they been seized under a writ against the property.

46.     This writ is not sought to hinder, delay, or defraud any creditor of Defendants.

47.     Defendants are not residents of this state.

48.     Payment of Davis Livestock's claims has not been secured by a line upon property in this state.

49.     Based on the lifetime of experience I have had in this business, given the nature of the transactions with which Defendants are involved, including international shipments of livestock, transactions that are often done without complete documentation, including the documentation of all monies paid and received, it would be very easy for Defendants to assign, dispose of, and/or conceal monies such that they would be beyond the reach or discovery of Davis Livestock should Davis Livestock be awarded judgment on its claims.  In fact, Defendants appear to have done that in this case when, at Defendants' request, Davis Livestock sent $100,000 for quarantine costs that Defendants did not use to pay quarantine costs, requiring Davis Livestock to pay a second time.

DATED this ___5th___ day of February, 2018.



Todd Davis

       On the 5th day of February, 2018, before me, the undersigned, a notary public, personally appeared Todd Davis, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same.

_____
NOTARY PUBLIC

Notary Public
**KRIS HENRIOD**
Commission #691753
My Commission Expires
November 2, 2020
State of Utah