# Exhibit L

# Livestock Export Agreement

Royal Atlantic
Holdings, LLC
**(Seller)**

Baladna Dairy Farm
**(Buyer)**

# Details

## (A) Date

July 6, 2017

## (B) Parties

| | |
|---|---|
| Name | Baladna Dairy Farm |
| Short form name | **Buyer** |
| Notice details | P.O. Box: 24590 Doha, Qatar |
| Attention: | Mr. Ramez Al Khayyat |

| | |
|---|---|
| Name | Royal Atlantic Holdings, LLC |
| Short form name | **Seller** |
| Notice details | 1000 N West Street, Suite 1200 Wilmington, DE 19301 |
| Attention: | Mr. Murat Berk and Mr. Brandon L. Webb |

## (C) Background

1. The Seller is in the business of supplying live animals, including the Livestock.
2. The Buyer wishes to buy the Livestock from the Seller.
3. The Seller has agreed to sell and the Buyer has agreed to buy the Livestock according to the terms of this agreement.



MB

Livestock Export Agreement page 2    2

# Agreed terms

## 1. Defined terms & interpretation

### 1.1 Defined terms

In this agreement:

**Business Day** means:

(a) for receiving a Notice under clause 13, a day that is not a Saturday, Sunday, public holiday or bank holiday in the place where the Notice is received; and

**Business Hours** means from 9.00am to 5.00pm US EST on a Business Day.

**Claim** means any claim, notice, demand, action, proceeding, litigation, investigation or judgment whether based in contract, tort, statute or otherwise.

**Delivery Date** means on or before September 10th, 2017

**Destination** means Los Angeles, CA (LAX) and New York, New York (JFK)

**Force Majeure Event** in respect of a party, means any event or occurrence that is outside that party's reasonable control, including, but not limited to earthquake, war, state or nationwide transportation embargo or state or nationwide industrial dispute.

**Government Agency** means any government or any governmental, semi-governmental, administrative, fiscal or judicial body, department, commission, authority, tribunal, agency or entity in the United States (whether federal, state or local) or any other part of the world.

**Livestock** means the livestock listed in Schedule 1.

**Purchase Price** means the amount calculated in Item 1 of Schedule 1 and specifications in attachment 1.

### 1.2 Headings

Headings are for ease of reference only and do not affect interpretation.

## 2. Sale and purchase

### 2.1 Sale and purchase

The Seller as beneficial owner agrees to sell the Livestock to the Buyer and the Buyer agrees to buy the Livestock for the Purchase Price.

## 3. Payment

### 3.1 Deposit and Payment

The Buyer must pay by transfer to the Seller on execution of this agreement as per the following schedule:

(a) A deposit of 10% of the total contract value ($ 479,000 USD) shall be made by the Buyer to the Seller's account as deposit for all 2,000 heifers listed in Schedule 1 of this agreement no later than July 17th, 2017.

(b) Within 48 hours of selection and at least ten business days prior to the scheduled departure, the full value of each scheduled shipment shall be made to the Seller's account on a shipment by shipment basis. Estimated quantity per shipment shall be 185 head making the approximate total per shipment $ 443,075 USD.

3

(c)  Post- shipment, final quantity shipped will be confirmed and all required USDA documentation, commercial invoice, certificate of origin (all certified by both the chamber of commerce and the Qatari Embassy) and packing list shall be presented by the Seller to the Buyer. Upon receipt of the complete document set by the Buyer, Buyer shall make final payment to Seller's account within three business days. Account details are as follows:

Royal Atlantic Holdings, LLC
1000 N West Street, Suite 1200
Wilmington, Delaware 19801
United States of America

Account: 128 668 5704

Wells Fargo Bank
San Francisco, CA
Routing Details: 121000248
SWIFT Code: WFBIUS6S

### 3.2 Shipment Documentation

After loading, the Seller shall supply the following documents; all documents should be in English version for the Buyer's convenience to verify the documents. Third party documents allowed.

1) SIGNED COMMERCIAL INVOICE IN 1 ORIGINAL 3 COPIES COVERING VALUE AND FULL DESCRIPTION OF GOODS AND STATING THAT GOODS ARE IN STRICT CONFORMITY WITH ISSUED PROFORMA INVOICES

2) CERTIFICATE OF ORIGIN IN 1 ORIGINAL AND 1 COPY CERTIFIED BY THE LOCAL CHAMBER OF COMMERCE SHOWING COUNTRY OF ORIGIN AS USA.

3) VETERINARY USDA HEALTH CERTIFICATE IN 1 ORIGINAL AND 1 COPY

4) PACKING LIST IN 1 ORIGINAL AND 1 COPY

### 3.3  Penalty of the Buyer for Non-Performance

(a)  If the Buyer breaches a provision of this agreement in a material respect, including not making the payment as per 3.1 (a), 3.1 (b), 3.1 (c) by the required date the Seller may notify the Buyer to remedy the breach within fifteen business days after receipt of the notice. If the Buyer fails to remedy the breach within that period, then the Seller may terminate this contract. If the Seller terminates this agreement under this clause, then the Seller will return the deposit to the Buyer less all costs incurred by the seller to the buyer.



MB

4. Selection of Livestock

4.1 **Selection of Livestock**

(a) The Seller will select the Livestock in the United States in accordance with the selection specifications set out in Item1 and the buyer will be free to reject any Livestock at will. Export-qualified breeding heifers cattle defined as all cattle meeting the specifications and health requirements detailed in Items 1 and 2.

(b) It is expected that selection will commence on or about July 15th

(d) All livestock to be supplied will be selected by the Buyer or his agent. It is understood that the heifers may be located at a separate location from the milking facility, but that the groups offered for selection will be from single origins and not mixed.

4.2 **Schedule**

(a) Selection is expected to start on or around July 15, 2017. At time of selection, Seller will present a packing list of the cattle to be presented that details the management identification, days carrying calf and electronic identification.

(b) The Seller will supply the following documents to the buyer within 48 hours of testing completion:

(i) Final isolation packing list with all positive or suspect animals removed.

The heifers will be vaccinated with Barvac 10

The heifers will be screened for BLV and Paratuberculosis

The heifers will be shipped to Qatar from 31/7/17 to 10/9/17

5. Delivery and shipping requirements

5.1 **Destination and date for delivery**

(a) The Seller must deliver the Livestock to the airport within 10 hours of scheduled flight departure and meeting all health requirements under the breeding cattle health protocol to be confirmed between Qatar and the United States. The Seller will load the Livestock into the transportation crates.

(b) The Buyer will notify the Seller of the estimated scheduled date of loading of the vessel by facsimile or email 7 calendar days prior to loading the aircraft.

(c) The Buyer shall be responsible for all aircraft related cost including inspection and approval of the aircraft by USDA, crating, netting and agent fees.

6. Claim and compensation

(a) The Seller will be responsible for any mortalities or sufficiently injured Livestock post selection or health rejects up until delivery to the airport and the loading is completed into the crates.

(b) The Seller will provide insurance for the flight and 21 days thereafter of 100% compensation for mortalities and 25% of the FOB value for any heifers that abort.

## 7. Veterinary and health requirements

(a) The Buyer shall provide an import permit from the Government of Qatar detailing health requirements as specified in Item 2.

(b) Seller will comply with the health requirements for breeding cattle exported from the United States to Qatar.

(c) The Seller will be responsible for ensuring the Livestock meet any applicable breeding cattle protocols. For the avoidance of doubt, Seller will provide serology reports from official USDA-approved laboratories and will also be responsible to deliver an international health certificate for breeding cattle to be exported from the United States.

## 8. Possession, ownership and insurance

### 8.1 Possession

Ownership of the livestock transfers to the Buyer upon delivery of the livestock to the airport and loading is completed into the crates.

## 9. Force Majeure

If either party is prevented from carrying out the whole or any part of its obligations under this Agreement in any capacity by reason of a Force Majeure Event, then a party (the "First Party") must give the other party (the "Other Party") notice of the occurrence of the Force Majeure Event and the particulars thereof, and the obligations of the First Party, so

far as they are affected by that Force Majeure Event, will be suspended during, but no longer than the continuation of that Force Majeure Event. No event of default entitling any Other Party to determine the rights, obligations and privileges conferred by, or agreements contained in this Agreement will be held to have occurred.

## 10. Capacity

Each party represents and warrants to each other party that:

(a) it is validly existing under the laws of its place of incorporation or registration;

(b) it has the power to enter into and perform its obligations under this agreement and to carry out the transactions contemplated by this agreement;

(c) it has taken all necessary action to authorise its entry into and performance of this agreement and to carry out the transactions contemplated by this agreement;

(d) its obligations under this agreement are valid and binding and enforceable against it in accordance with their terms; and

## 11. Dispute resolution

### 11.1 Compulsory process

A party must not start arbitration or court proceedings in respect of a dispute arising out of or relating to this agreement, or the breach, termination or invalidity of this agreement (**Dispute**) unless it has complied with this clause 12.

### 11.2 Notification

A party claiming that a Dispute has arisen must notify each other party to the Dispute



giving details of the Dispute.

### 11.3 Initial period – efforts to resolve Dispute

During the 21 day period after a notice is given in writing by the parties to the Dispute (**Initial Period**) each party to the Dispute (**Disputant**) must use its reasonable efforts to resolve the Dispute.

### 11.4 Mediation

If the Disputants are unable to resolve the Dispute within the Initial Period, each Disputant agrees that the Dispute must be referred for mediation, at the request of any Disputant, to:

(a) a mediator agreed on by the Disputants; or

(b) if the Disputants are unable to agree on a mediator within seven days after the end of the Initial Period, a mediator nominated by the then current Chairman of LEADR or the Chairman's nominee.

### 11.5 Role of mediator

The role of any mediator is to assist in negotiating a resolution of the Dispute. A mediator may not make a decision that is binding on a Disputant unless that Disputant has agreed in writing.

### 11.6 Information

Any information or documents disclosed by a Disputant under this clause 12:

(a) must be kept confidential; and

(b) may not be used except to attempt to resolve the Dispute.

### 11.7 Arbitration

If all disputes unable to be resolved by mediation are referred for arbitration. The appointing authority shall be the Switzerland Centre for International Commercial Arbitration. The number of arbitrators shall be 1. The place of arbitration shall be Switzerland. The language to be used in the arbitral proceedings shall be English.

### 11.8 Costs of dispute resolution process

Each Disputant must pay its own costs of complying with this clause 12. The Disputants must pay equally the costs of any mediator engaged and the costs of arbitration per the determination of the arbitrator.

### 11.9 Breach of process

If in relation to a Dispute a Disputant breaches any provision of clauses 12.1 to 12.7, each other Disputant need not comply with clause 12.2 in relation to that Dispute.

## 12. Notices and other communications

### 12.1 Service of notices

A notice, demand, consent, approval or communication under this agreement (**Notice**) must be:

(a) in writing, in English and signed by a person duly authorized by the sender; and

(b) hand delivered or sent by prepaid post or email to the recipient's email address for Notices specified in the Details, as varied by any Notice given by the recipient to the sender.

### 12.2 Effective on receipt

A Notice given in accordance with clause 13.1 takes effect when taken to be received (or at a later time specified in it), and is taken to be received.



If the delivery, receipt or transmission is not on a Business Day or is after 5.00pm on a Business Day, the Notice is taken to be received at 9.00am on the next Business Day.

## 13. Miscellaneous

### 13.1 Alterations

This agreement may be altered only in writing signed by each party.

### 12.2 Assignment

A party may only assign this agreement or a right under this agreement with the prior written consent of each other party.

### 13.3 Costs

Each party must pay its own costs of negotiating, preparing and executing this agreement.

### 13.4 Survival

Any indemnity or any obligation of confidence under this agreement is independent and survives termination of this agreement. Any other term by its nature intended to survive termination of this agreement survives termination of this agreement.

### 13.5 Counterparts

This agreement may be executed in counterparts. All executed counterparts constitute one document.

### 13.6 No merger

The rights and obligations of the parties under this agreement do not merge on completion of any transaction contemplated by this agreement.

### 13.7 Entire agreement

This agreement constitutes the entire agreement between the parties in connection with its subject matter and supersedes all previous agreements or understandings between the parties in connection with its subject matter.

### 13.8 Further action

Each party must do, at its own expense, everything reasonably necessary (including executing documents) to give full effect to this agreement and the transactions contemplated by it.

### 13.9 Severability

A term or part of a term of this agreement that is illegal or unenforceable may be severed from this agreement and the remaining terms or parts of the term of this agreement continue in force.

### 13.10 Waiver

A party does not waive a right, power or remedy if it fails to exercise or delays in exercising the right, power or remedy. A single or partial exercise of a right, power or remedy does not prevent another or further exercise of that or another right, power or remedy. A waiver of a right, power or remedy must be in writing and signed by the party giving the waiver.

### 13.11 Relationship

Except where this agreement expressly states otherwise, it does not create a relationship of employment, trust, agency or partnership between the parties.

### 13.12 Confidentiality

A party may only use confidential information of another party for the purposes of this agreement, and must keep the existence and the terms of this agreement and any



confidential information of another party confidential except where:

(a) the information is public knowledge (but not because of a breach of this agreement) or the party has independently created the information;

(b) disclosure is required by law or a regulatory body (including a relevant stock exchange); or

(c) disclosure is made to a person who must know for the purposes of this agreement on the basis that the person keeps the information confidential.

Item 1:

| Breed | Quantity Required (head) | Unit Price FOB | Total US$ |
|---|---|---|---|
| Quality Holstein Heifers pregnant 4-7 months at time of shipment, weighing a minimum average of 500kg and sourced from elite US herds with daily averages ranging from 39-45 liters<br><br>Heifers shall be genomically tested by an independent company such as Zoetis or GeneSeeek with the genomic results made available to the Buyer prior to the actual export with the genomic result being confirmed with a minimum gTPI of 1800 and with an average of over 1950. The Buyer has the opportunity to witness all genomic sampling of the individual heifers.<br>The genomic test will also identify all A2 heifers.<br>The genomic results shall be provided in either Excel or through Dairy Comp 305/ PC Dart reports. | 2000 | US$2,395 | US$4,790,000 |
| TOTAL | 2000 | | US$4,790,000 |

**Total: Approximately a minimum of 2000 head delivered by the 10th of September**

The USDA accredited veterinarian shall certify to the following statements:

## IMPORT HEALTH REQUIREMENTS OF QATAR
## FOR BREEDING CATTLE FROM THE UNITED STATES OF AMERICA

The animals must be accompanied by a U.S. Origin Health Certificate in English issued by a veterinarian so authorized by the U.S. Department of Agriculture (USDA) and endorsed by a Veterinary Services veterinarian. The certificate must contain the name and address of the consignor and the consignee and individual identification of the animals indicating the breed, sex, age, and tattoo number and/or eartag of the animals to be exported. Additional information must include:

CERTIFICATION STATEMENTS

1) The animals were born in the United States of America or were legally imported into the United States of America from North America.

2) The animals were born after the date from which the ban with meat-and-bone meal and greaves derived from ruminants was effectively enforced.

3) The animals are identified with a permanent identification system recognized by the USDA.

4) The United States of America is recognized by World Organization for Animal Health (OIE) as a country having a negligible risk status for
BSE.

5) Upon inspection, prior to export, the animals were found clinically healthy.

6) The animals are from brucellosis certified free herds or states and were negative to a card, or rivanol or complement fixation serologic test within a period not more than 30 days prior to export. The test will not be required for cattle less than 6 months of age or less than 24 months of age certified to be vaccinated against brucellosis using RB51 vaccine.

7) The animals did not show clinical signs of piroplasmosis.

8) The animals were inspected and found free of clinical signs of infectious bovine rhinotracheitis (IBR) and leptospirosis and were vaccinated between 10 and 90 days prior to the date of export against IBR with an active intra-nasal vaccine and against leptospirosis, using a polyvalent bacterin against (*L pomona, L icterohemorrhagiae, L canicola, L grippotyphosa* and *L hardjo*).

9) The animals are free of ticks of the *Boophilus* genus and do not come from areas under quarantine due to *Boophilus* spp ticks. (Agreement establishing the National Campaign to Control the *Boophilus* spp ticks).

10) Upon inspection at embarkation by a USDA or accredited veterinarian, the animals were clinically healthy, without wounds that were open or in process of healing and as could be ascertained were free of transmissible diseases.

# Signing page

**EXECUTED** as an agreement.

**Executed** by Royal Atlantic Holdings, LLC with its Constitution

_____  ←
Signature of director

MURAT  BERK        July 6th, 2017

Name of sole director (print)


**Executed** for and on behalf of Baladna Dairy Farm with its Constitution:

John Done    6/7/17
_____  ←
Signature of director

CEO

Name of director (print)

