D. Craig Parry (#7274)
Stephen C. Mouritsen (#16523)
Parr Brown Gee & Loveless
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Fax: (801) 532-7750
Email: cparry@parrbrown.com
      smouritsen@parrbrown.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| DAVIS LIVESTOCK, INC., a domestic Utah corporation<br><br>           Plaintiff,<br><br>vs.<br><br>ROYAL ATLANTIC HOLDINGS, LLC, a foreign Delaware limited liability company; and BRANDON WEBB, an individual;<br><br>           Defendants. | **FINDINGS AND ORDER ON PLAINTIFF'S MOTION FOR WRIT OF ATTACHMENT**<br><br>Case No. 1:18-cv-00022-BSJ<br><br>Judge Bruce S. Jenkins |

      A hearing in the above-caption case was held on February 15, 2018, on Plaintiffs' *Ex parte* Motion for a Writ of Attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure and Rules 64A and 64C of the Utah Rules of Civil Procedure, against defendants Royal Atlantic Holdings, LLC and Brandon Webb (collectively, the "Defendants").

      Based upon the Motion and supporting memorandum, the Affidavit of Todd Davis, the pleadings, arguments of counsel, and good cause appearing therefore, the Court hereby finds and orders as follows:

1

## Findings of Fact

1. Davis Livestock, Inc. is a three-generation family owned and operated business in Cache County, Utah that has been breeding, selling and brokering diary heifers and other agricultural animals for 70 years.

2. Davis Livestock ships to farms throughout North America and the world.

3. Brandon Webb represented to Davis Livestock that Royal Atlantic is a facilitator that partners with other companies to deliver livestock to customers throughout the world, offering assistance with supplying herd, pre-export isolations, export, shipping, import, and sales.

4. On or about October 31, 2016, Webb contacted Davis Livestock representing that Royal Atlantic had secured a group of buyers of cattle in Turkey and that receipt of the livestock would take place at the port of Izmir, Turkey.

5. Royal Atlantic and Webb sought financing of the herd from Davis Livestock.

6. Davis Livestock and Royal Atlantic agreed that Davis Livestock would sell over 3000 head of cattle to Royal Atlantic on the following terms: (1) Royal Atlantic would pay Davis Livestock its costs and expenses in providing the cattle; (2) Additionally, Royal Atlantic would pay Davis Livestock $162,500 for the Holstein heifers and $350,000 for the Angus cattle; and (3) Payment in full would be provided to Davis Livestock before the cattle were boarded on the ship in the U.S.

7. In reliance on these representation and this agreement, Davis Livestock acquired the cattle and paid an initial deposit on the cattle of $479,000. The total price Davis Livestock paid for the cattle was $3,897,673.57.

8. Webb, on behalf of Royal Atlantic, confirmed that buyers in Turkey had been secured and that receipt of the livestock would take place at the port of Izmir, Turkey.

9. During September through December, 2016, Webb repeatedly represented to Davis Livestock that Royal Atlantic had the financial resources to facilitate this transaction and cover all necessary costs and fees.

10. Subsequent statements by Royal Atlantic and Webb and their requests for money indicated to Davis Livestock that they in fact did not have sufficient financial means to pay the necessary costs and fees of the transaction.

11. On or about December 13, 2016, when the cattle were on route to Pennsylvania, Webb informed Davis Livestock that Royal Atlantic could not pay the deposit for the ship and demanded that Davis Livestock pay $100,000. Royal Atlantic promised that this amount would be reimbursed before the cattle were boarded on the ship. Davis Livestock paid the $100,000, but it was not reimbursed.

12. On or about January 3, 2017, Webb informed Davis Livestock that Royal Atlantic could not pay the quarantine deposit and demanded that Davis Livestock pay $100,000 for the deposit. Davis Livestock had no choice but to pay given the imminent departure of the ship that was scheduled between January 10 and 15.

13. On or about January 5, 2017, without permission of Davis Livestock, Webb entered into a feed contract with Green Meadows Forage, LLC as a representative of Davis Livestock.

14. On or about January 17, 2017, Davis Livestock became aware that quarantine deposit and invoice remained unpaid and that the $100,000 provided by Davis Livestock to Royal Atlantic for the quarantine deposit was not paid to the quarantine provider.

3

15. By this time, Davis Livestock had incurred over $1.7 million in expenses on this transaction, including the acquisition cost of the cattle, all of which was at risk of being lost if the cattle were not processed through quarantine in time for boarding the ship. Accordingly, Davis Livestock had no choice but to pay an additional $100,000 quarantine deposit and a $199,455.66 quarantine bill.

16. In the same manner, Davis Livestock was also forced to pay feed and veterinary bills that Royal Atlantic was obligated to pay under the terms of the agreement. Some of these bills were not brought to Davis Livestock's attention until after the cattle were aboard the ship and sailing to Turkey.

17. Given Royal Atlantic's business and purported experience, the nature and estimated extent of these costs and expenses were known to Defendants in advance, and at the time when Royal Atlantic agreed to pay for all such expenses and at the time Defendants were representing to Davis Livestock that they had the financial wherewithal to fulfill their obligations under the agreement and the transaction.

18. Davis Livestock provided the agreed-upon livestock to Royal Atlantic at the designated location and in all ways complied with the agreement between the parties.

19. Royal Atlantic represented to Davis Livestock that there was a delay with the ship such that it would not depart until the end of January, 2017. On or about January 31, 2017, Davis Livestock learned that Royal Atlantic had started allowing the cattle to be boarded, even though Davis Livestock had not been paid as agreed. Davis Livestock contacted the carrier and requested that all boarding stop; however, on February 1, 2017, the carrier informed Davis Livestock that Webb and Royal Atlantic were instructing that the loading should continue the

4

next day. When Davis Livestock contacted Webb, Webb stated that it was all a misunderstanding.

20. Contrary to the agreement, Royal Atlantic boarded the cattle onto the ship and shipped them to Turkey without making payment to Davis Livestock. Royal Atlantic did this without having buyers.

21. As the boarding continued, on February 2, Webb and Royal Atlantic stated that the outstanding balance owed to Davis Livestock would be "less than $100,000 by tomorrow." Defendants further misrepresented that letters of credit and cash payments would be received on February 3.

22. On February 3, Defendants represented that cash payments were being processed and would be transferred to Davis Livestock that day, that letters of credit had been approved, and that all cash proceeds would be passed directly to Davis Livestock.

23. The cash and letters of credit were not sent as promised.

24. The loading of the livestock proceeded on February 4, and the ship undocked on February 5. In total, 3,165 head of cattle supplied by Davis Livestock were transported on the ship, livestock Royal Atlantic had agreed to purchase.

25. On February 19, while the cattle were at sea, Defendants represented to Davis Livestock that all original bills of lading required by the letters of credit had been released, except for the cash buyers whose bills of lading would be released by the following day. However, as Defendants knew, Defendants had not secured Turkish buyers, and neither the cash nor the letters of credit had been received.

26. The ship carrying the cattle arrived in Izmir on or about February 26, 2017. By March 2, 2017, approximately 450 head of cattle could not be discharged from the ship due to

the absence of buyers. Webb contacted Davis Livestock, stating that if Davis Livestock did not pay the shipping company an additional $230,000 to transport the remaining 450 head of cattle to the port of Abhazya, the cattle would be released to Turkish customs and slaughtered.

27. On or about March 16 and April 19, 2017, Defendants represented that the 450 head of cattle had been sold for cash, but none of the proceeds were ever transferred to Davis Livestock.

28. In total, Davis Livestock incurred over $4.9 million in expenses for the livestock that Royal Atlantic was obligated to reimburse under the agreement and pursuant to Defendants' representations. While Royal Atlantic has made some payments to Davis Livestock for these expenses, approximately $1 million remains outstanding. Additionally, Royal Atlantic never paid Davis Livestock $162,500 for the Holstein heifers and $350,000 for the Angus cattle.

29. On June 7, 2017, a representative of Baladna Dairy Farms in Qatar contacted Davis Livestock and inquired about purchasing several thousand head of Holstein heifers. Davis Livestock agreed to supply the cattle.

30. On May 19, 2017, Defendants had represented to Davis Livestock that they would share all profits on future deals with Davis Livestock until Davis Livestock was made whole for the Turkey transaction. Although Davis Livestock could have fulfilled this order and shipped the cattle without the involvement of Royal Atlantic, in reliance on Defendants' representations, Davis Livestock informed Defendants of the opportunity and invited them to participate, as a way to generate money that Defendants could then use to pay monies owed to Davis Livestock.

31. Following this introduction, Defendants communicated with Baladna about the transaction.

32. Defendants represented to Davis Livestock that it would receive at least $135 per head from the Qatar transaction.

33. On July 3, 2017, Defendants affirmed to Davis Livestock the amounts owing to Davis Livestock for the Turkey transaction and reaffirmed their commitment to pay the amounts in full.

34. On July 7, 2017, Defendants informed Davis Livestock that Qatari customs authorities were permitting Defendants to draft the import protocol. On July 12, 2017, Defendants forwarded Davis Livestock a link to money.cnn.com, featuring the anticipated Qatari transaction. On July 13, 2017, Defendants informed Davis Livestock of the scheduled transportation with Qatar Airways, setting forth the shipment of the cattle from the United States of America to Qatar.

35. On July 13, 2017, to avoid a repeat of the Turkey transaction, Todd Davis told Defendants that, "I would like the funds sent directly to my account. I want to know exactly what is going on every step of the way. I brought this deal to you and want to make sure you make money as well but I need to control the purse strings on this one . . ."

36. On that same day, however, Defendants for the first time asserted that Davis Livestock had no involvement in or right to the proceeds of the Qatar transaction.

37. Unbeknownst to Davis Livestock, and contrary to Defendants' representations, Royal Atlantic entered into an agreement with Baladna for the delivery of the livestock on July 7, 2017. This contract was not disclosed to Davis Livestock until August 17, 2017.

38. I am informed that in the course of negotiating and working with Baladna and other parties involved in the Qatar transaction, Defendants misrepresented that they were acting

7

for and on behalf of Davis Livestock and misrepresenting their affiliation with Davis Livestock. This was done to induce Baladna to entering into the agreement with Royal Atlantic to the exclusion of Davis Livestock.

39. Pursuant to the relationship with Baladna, Royal Atlantic has provided 2,000 Holstein heifers to Baladna at a price of $2,395 per head. I am informed that Baladna has ordered an additional 6,600 head from Royal Atlantic.

40. I have been informed that when confronted by those in the industry with knowledge of the monies owing from Defendants to Davis Livestock, Webb has relied that, "He [Davis] cannot touch me."

41. Given the nature of the transactions with which Defendants are involved, including international shipments of livestock, transactions that are often done without complete documentation, including the documentation of all monies paid and received, it would be very easy for Defendants to assign, dispose of, and/or conceal monies such that they would be beyond the reach or discovery of Davis Livestock should Davis Livestock be awarded judgment on its claims. In fact, Defendants appear to have done that in this case when, at Defendants' request, Davis Livestock sent $100,000 for quarantine costs that Defendants did not use to pay quarantine costs, requiring Davis Livestock to pay a second time.

**Findings and Conclusions of Law under Utah Rules of Civil Procedure 64A and 64C**

1. The Royal Atlantic assets are neither earnings, as that term is defined in *Utah Rule of Civil Procedure* 64(a)(5), nor exempt from execution.

2. This writ is not sought to hinder, delay, or defraud any creditor of Defendants.

3. There is a substantial likelihood that Davis Livestock will prevail on the merits of its underlying claims of breach of contract, fraud, conversion, and *quantum meruit*.

4. Defendants have assigned, disposed of or concealed, or are about to assign, dispose of or conceal the Royal Atlantic assets with the intent to defraud Davis Livestock.

5. Defendants incurred the obligations that are the subject of this action through fraud.

6. There is probable cause that Davis Livestock will lose its ability to recover any damages from Defendants if the writ is not issued.

7. This writ is issued without notice to Defendants because of the likelihood that Defendants would forthwith assign, dispose of, or conceal the Royal Atlantic assets should they be given notice prior to issuance of the writ.

8. The property to be attached by prejudgment writ includes all cash, security documents, letters of credit, and other financial instruments held by or in the name of Royal Atlantic Holdings, LLC ("Royal Atlantic assets"), with a registered address of 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801, phone: 717-542-6985 at Wells Fargo Bank N.A.

9. The estimated value of the Royal Atlantic assets is unknown to Davis Livestock.

10. Royal Atlantic has an account at Wells Fargo Bank N.A., 420 Montgomery Street, San Francisco, CA 94105 and at a Philadelphia, Pennsylvania branch, account number xxx xxx 5704 (redacted for confidentiality purposes). Wells Fargo Bank, N.A., International Trade Operations, 1525 West WT Harris Blvd., Charlotte, N.C. may also be holder of certain letters of credit in Royal Atlantic's name.

11. The Royal Atlantic assets have not been taken for a tax, assessment or fine, nor have they been seized under a writ against the property.

12. Defendants are not residents of Utah.

13. Payment of Davis Livestock's claims has not been secured by a lien upon property in Utah.

14. The writ is issued as of February 20, 2018, at __11:45__ p.m. and shall continue in effect until March 6, 2018, at __5 o'clock__ p.m., unless extended by the Court after a hearing.

15. A hearing shall be held on __5th Day of March__, 2018, at __1:30__ p.m. in room 7.200 of the United States District Courthouse, 351 S. West Temple, Salt Lake City, Utah.

16. Davis Livestock shall promptly provide notice of the Writ, the hearing, and all pleadings on file to Defendants by email at Defendants' current email addresses: blwebb07@gmail.com and lianimalhealth@gmail.com and by overnight mail to the address set forth on the Complaint and to Brandon Webb, West Grove Downs Stables, 620 W. Old Baltimore Pike, West Grove, PA 19390.

17. Good cause exists for not requiring that Plaintiff post security for this Writ in that the Royal Atlantic Assets are not being paid to Plaintiff but rather are being held at Defendants' bank. Should the Writ be dissolved at a later date, all Royal Atlantic Assets will have been preserved and not to any degree dissipated.

DATED this 20th day of February, 2018.

BY THE COURT:

_____
Judge Bruce S. Jenkins